1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **CALIFORNIA SPORTFISHING PROTECTION ALLIANCE,** *et al.,*<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**UNITED STATES BUREAU OF RECLAMATION,** *et al.,*<br><br>**Defendants.** | **1:15-cv-00912 LJO BAM**<br><br>**MEMORANDUM DECISION AND ORDER GRANTING FEDERAL DEFENDANTS' MOTION TO DISMISS (Doc. 50)** |

**I. INTRODUCTION**

This case concerns Temporary Urgency Change Petitions ("TUCP") requesting temporary modification of water quality standards and objectives included in the California State Water Resources Control Board's ("State Board") Revised Decision 1641 ("D-1641"), associated approvals of those TUCPs by the State Board pursuant to California Governor Edmund G. Brown, Jr.'s ("Governor Brown") December 22, 2014 Executive Order B-28-14, and implementation of approved modifications to D-1641's requirements during the late winter and spring of 2015. Plaintiffs, a coalition of environmental organizations led by the California Sportfishing Protection Alliance (collectively, "Plaintiffs"), originally filed suit against the United States Bureau of Reclamation (the "Bureau" or "Reclamation") and related federal entities and officials ("Federal Defendants"); the State Board and various State Board officials ("State Board Defendants"); and the California Department of Water

1

Resources ("DWR") and DWR's Director (collectively, "DWR Defendants"). *See* Doc. 43.

On August 19, 2015, Plaintiffs voluntarily dismissed all claims in the currently operative First Amended Complaint ("FAC"), Doc. 43, against the State Board Defendants and DWR Defendants. *See* Doc. 52. Remaining are two causes of action against Federal Defendants, generally alleging that Federal Defendants failed to comply with water quality standards set forth in the Central Valley Project Improvement Act ("CVPIA"), Pub. L. No. 102–575, 106 Stat. 4600 (1992), the Clean Water Act ("CWA"), 33 U.S.C. § 1251 *et seq.*, and various other provisions of state and federal law, in part because neither the State Board nor Governor Brown has the authority to waive Federal Defendants' legal duties.

Federal Defendants move to dismiss the remaining claims under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Doc. 50. Federal Defendants argue that the actions challenged in this case do not constitute "agency action" as that term is defined by the Administrative Procedure Act ("APA"), 5 U.S.C. § 551(13); 5 U.S.C. §§ 701 *et seq.*, and thus this Court lacks jurisdiction over Plaintiffs' claims. Doc. 50-1. In the alternative, Federal Defendants argue Plaintiffs fail to state a claim on which relief may be granted. Plaintiffs oppose dismissal. Doc. 55. Federal Defendants replied. Doc. 56. The Court took the matter under submission on the papers pursuant to Local Rule 230(g). Doc. 57.

## II. FACTUAL BACKGROUND

The CVP is "a system of dams, reservoirs, levees, canals, pumping stations, hydropower plants, and other infrastructure that distributes water throughout California's vast Central Valley." *San Luis Unit Food Producers v. United States*, 709 F.3d 798, 801 (9th Cir. 2013) (internal citation and quotation omitted). "The Bureau is the agency within the Department of the Interior charged with administering the CVP." *Id.* The Bureau operates the CVP in coordination with DWR, the California agency in charge of operating the parallel State Water Project ("SWP"). *Pac. Coast Fed'n of Fishermen's Ass'ns v. Gutierrez*, 606 F. Supp. 2d 1195, 1225 (E.D. Cal. 2008) ("*PCFFA*").

The Sacramento-San Joaquin River Delta ("Delta"), which lies at the convergence of the

2

Sacramento, San Joaquin, and other rivers, forms the centerpiece of a "massive and fragile ecosystem" and the heart of both the CVP and the SWP. *See San Luis & Delta-Mendota Water Auth. v. United States*, 672 F.3d 676, 682 (9th Cir. 2012).

> The Delta serves as a conduit for the transfer of water by the statewide water projects. Both the CVP and the SWP divert water from the rivers that flow into the Delta and store the water in reservoirs. Quantities of this stored water are periodically released into the Delta. Pumps situated at the southern edge of the Delta eventually lift the water into canals for transport south to the farmers of the Central Valley and the municipalities of Southern California. Water which is neither stored nor exported south passes through the Delta where it is used by local farmers, industries and municipalities. The excess flows out into the San Francisco Bay.

*United States v. State Water Res. Control Bd.*, 182 Cal. App. 3d 82, 97 (1986).

Pursuant to permits granted by the State Board, the state agency charged with the task of issuing permits to appropriate water and exercising functions related to water pollution and quality control, *see* Cal. Water Code § 179, the Bureau "appropriates water from various [] sources, and delivers it for beneficial uses to central California areas." *Cent. Delta Water Agency v. United States*, 306 F.3d 938, 943 (9th Cir. 2002). Among other conditions, Reclamation's operation of CVP facilities in the Delta must comply with the State Board's D-1641. *See PCFFA*, 606 F. Supp. 2d at 1133; *see also* CVPIA § 3406(b) ("The Secretary [of the Interior] ... shall operate the [CVP] to meet ... all decisions of the [] State [] Board establishing conditions on applicable licenses and permits for the project."). D-1641 implements the Bay Delta Water Quality Control Plan ("Bay Delta Plan")[1] through modifications to the

---

[1] The State Board promulgated the Bay Delta Plan to comply with requirements of state law and federal CWA provisions regarding the promulgation of "water quality standards."

> "Water quality standards" are, in general, promulgated by the states and establish the desired condition of the waterway. [33 U.S.C. §] 1313. The EPA provides states with substantial guidance in the drafting of water quality standards, and the states must submit the standards to the EPA for review and approval. Water quality standards under the Clean Water Act generally consist of three elements: 1) one or more designated "uses" of that waterway; 2) water quality "criteria" specifying the amount of various pollutants that may be present in those waters and still protect the designated uses, expressed in numerical concentration limits or narrative form; and 3) a provision restricting the degradation of certain waters. Sections 1313(c)(2) and 1313(d)(4)(B).

*Nat'l Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 92 F. Supp. 2d 1072, 1075 (D. Or. 2000) ("*NWF v. USACOE*"). The Bay

CVP, SWP, and other water rights permits, by, among other things, regulating salinity levels in the Delta, setting minimum Delta outflow requirements, and regulating export rates of the CVP and SWP.[2] The U.S. Environmental Protection Agency ("EPA") also promulgated water quality standards applicable to the Delta. *See* 40 C.F.R. § 131.37.

In response to extreme drought conditions prevailing in California, Governor Brown issued a number of Proclamations and Executive Orders permitting, if not encouraging, the State Board to consider making changes to water permits in order to conserve water for future use. On January 17, 2014, Governor Brown issued a Proclamation stating:

> The Water Board will consider modifying requirements for reservoir releases or diversion limitations, where existing requirements were established to implement a water quality control plan. These changes would enable water to be conserved upstream later in the year to protect cold water pools for salmon and steelhead, maintain water supply, and improve water quality.

Office of Governor Edmund G. Brown, Jr., *Governor Brown Declares Drought State of Emergency*, January 17, 2014, at ¶ 9, *available at* https://www.gov.ca.gov/news.php?id=18379 (last visited Oct. 18, 2015). This Proclamation suspended operation of California Water Code § 13247 (requiring state agencies to comply with water quality control plans approved by the State Board) and the California Environmental Quality Act, Cal. Pub. Res. Code § 21000, *et seq*., as to actions taken by DWR and the State Board to "make water immediately available." *Id*. at ¶ 9. On December 22, 2014, Governor Brown

---

Delta Plan identified beneficial uses to be served by the waters of the Delta. "These uses fall into three broad categories: municipal and industrial, agricultural, and fish and wildlife." *State Water Res. Control Bd. Cases*, 136 Cal. App. 4th 674, 701 (2006). The Bay Delta Plan also identified water quality objectives with respect to each of these categories of uses. *See id.*

> The [State] Board established various salinity objectives "for the reasonable protection of [agriculture as a beneficial use] from the effects of salinity intrusion and agricultural drainage in the western, interior, and southern Delta." To protect fish and wildlife uses, the [State] Board's plan established objectives for six parameters: dissolved oxygen, salinity, amounts of Delta outflow, river flows, export limits, and Delta cross-channel gate operation. The plan also included a narrative objective for salmon protection.

*Id.*

[2] The full text of D-1641 is available at: http://www.swrcb.ca.gov/waterrights/water_issueas/programs/bay_delta/decision_1641/index.shtml (last visited October 18, 2015).

4

1    issued Executive Order B-28-14, which extended the suspension of California Water Code § 13247 and

2    CEQA through May 31, 2016. Office of Governor Edmund G. Brown, Jr., *Executive Order B-28-14*,

3    December 22, 2014, *available at* https://www.gov.ca.gov/news. php?id=18815 (last visited Oct. 18,

4    2015).

5            On January 23, 2015, Reclamation and DWR jointly filed a TUCP with the State Board seeking

6    temporary modifications to their water rights to, among other things, permit Reclamation and DWR to

7    reduce instream flow requirements in the Delta to conserve water for future use. *See* FAC at ¶ 1. On

8    February 3, 2015, the State Board issued an order approving in part and denying in part the TUCP

9    ("February 3, 2015 Order"). *Id*. at ¶ 2. On March 24, 2105, the Bureau and DWR submitted another

10   TUCP requesting an extension of the modifications granted in the February 3, 2015 Order. *Id*. at ¶ 4. On

11   April 6, 2105, the State Board issued an order granting in part and denying in part the requested

12   extension of the TUCP ("April 6, 2015 Order"). *Id*. at ¶ 5.

13                                 **III. <u>ANALYSIS</u>**

14   **A.      <u>Claims in this Case.</u>**

15           Plaintiffs' main contention in this case is that neither the February 3, 2015 Order nor the April 6,

16   2015 Order (collectively, the "TUCP Orders") absolves the Bureau, a federal agency, from compliance

17   with water quality standards found in, among other places, EPA regulations, 40 C.F.R. § 131.37, and the

18   CVPIA's requirement that the Bureau operate the CVP in compliance with state and <u>federal</u> water

19   quality requirements. *Id*. at ¶ 7. However, apart from this general contention, it is somewhat difficult to

20   determine the exact nature of Plaintiffs' remaining claims. Plaintiffs' first cause of action is entitled:

21   "Violation of CWA, CVPIA and APA - Failure to Comply with Central Valley Improvement Act." FAC

22   at 28. Among other things, this claim alleges that "[n]otwithstanding the State Board's February 3, 2015

23   and April 6, 2015 Orders, the Bureau must operate the CVP in compliance with the Bay-Delta water

24   quality standards, the [CVPIA] and the [CWA.]" *Id*. at ¶ 132. It appears that this claim is designed to

25   arise under the CVPIA, which directs the Secretary of the Interior to operate the CVP "to meet all

5

obligations under state and federal law, including but not limited to ... all decisions of the [State Board] establishing conditions on applicable licenses and permits for the project." CVPIA § 3406(b); *see* FAC at ¶ 71 (citing CVPIA § 3406(b)). The first cause of action further appears to allege that Federal Defendants violated the CVPIA by, among other things, failing to comply with the CWA.

The scope of the second cause of action, entitled "Violation of CWA, CVPIA and APA - Operation of CVP in Violation of Water Quality Standards," *id*. at 29, is likewise somewhat unclear. For example, paragraph 135 contains a number of statutory references, including yet another reference to the CVPIA:

> Plaintiffs are informed and believe, and thereupon allege, that Defendant Bureau has been operating the Central Valley Project in violation of applicable water quality standards contained in the Bay-Delta Plan, D-1641, the EPA Bay-Delta Standards, the Delta Protection Act, and the Central Valley Project Improvement Act. Plaintiffs are informed and believe, and thereupon allege, that the Bureau is operating the Central Valley Project in a manner that is harming designated beneficial uses of the Bay-Delta.

*Id*. at ¶ 135. In light of assertions made in Plaintiffs' opposition, *see, e.g.*, Doc. 55 at 11 ("The court has federal question subject matter jurisdiction under 28 U.S.C. § 1331, because this action is enforcing the Bureau's failure to comply with federal law, namely Section 1323 of the CWA and Section 3406(b) of the CVPIA."), and the fact that the first cause of action appears to be a CVPIA claim, the Court concludes that the second cause of action alleges a violation of 33 U.S.C § 1323, a section of the CWA that provides that every federal agency must "comply with, all Federal, State, interstate, and local requirements, administrative authority, and process and sanctions respecting the control and abatement of water pollution in the same manner, and to the same extent as any nongovernmental entity." 33 U.S.C. § 1323(a).

**B.**     **Motion to Dismiss for Lack of Jurisdiction.**

    **1.**     **Standard of Decision.**

Federal Rule of Civil Procedure 12(b)(1) provides for dismissal of an action for "lack of subject-

1   matter jurisdiction." Faced with a Rule 12(b)(1) motion, a plaintiff bears the burden of proving the

2   existence of the court's subject matter jurisdiction. *Thompson v. McCombe*, 99 F.3d 352, 353 (9th Cir.

3   1996). A federal court is presumed to lack jurisdiction in a particular case unless the contrary

4   affirmatively appears. *Gen. Atomic Co. v. United Nuclear Corp.*, 655 F.2d 968, 968-69 (9th Cir. 1981).

5   A challenge to subject matter jurisdiction may be facial or factual. *White v. Lee*, 227 F.3d 1214, 1242

6   (9th Cir. 2000). As explained in *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1038 (9th Cir. 2004):

7   
8   
9   

> In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction. By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction.

10   The present motion is a facial attack, because Federal Defendants "contend[] that the allegations of

11   jurisdiction contained in the complaint are insufficient on their face to demonstrate the existence of

12   jurisdiction." *Beco Dairy Automation, Inc. v. Global Tech Sys., Inc.*, __ F. Supp. 3d __, 2015 WL

13   2185121, at *4 (E.D. Cal. May 8, 2015) (internal citation and quotation omitted). In a facial attack, "the

14   plaintiff is entitled to safeguards similar to those applicable when a 12(b)(6) motion is made." *Id*. "The

15   factual allegations of the complaint are presumed to be true, and the motion is granted only if the

16   plaintiff fails to allege an element necessary for subject matter jurisdiction." *Id*.; *see also Cassier v.*

17   *Kingdom of Spain*, 580 F.3d 1048, 1052 n. 2 (9th Cir. 2009), *rev'd on other grounds*, 616 F.3d 1019 (9th

18   Cir. 2010) (en banc) (applying *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), standard to a facial motion to

19   dismiss for lack of subject matter jurisdiction); *Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004)

20   ("[I]n reviewing a Rule 12(b)(1) motion to dismiss for lack of jurisdiction, we take the allegations in the

21   plaintiff's complaint as true.").

22          **2.      Administrative Procedure Act.**

23          The United States, as a sovereign, is immune from suit unless it has expressly waived immunity

24   and consented to be sued. *See United States v. Mitchell*, 463 U.S. 206, 212 (1983). Federal Defendants

25   move to dismiss for lack of jurisdiction because the only waiver of sovereign immunity pled by

7

1    Plaintiffs is that contained in the APA § 702; APA § 702's waiver is limited by APA § 704's

2    requirement of "final agency action"; and the acts of Federal Defendants challenged in this lawsuit do

3    not qualify as final agency action as that phrase is defined in the APA. Doc. 50-1 at 5-7. Plaintiffs do not

4    dispute that APA § 702 provides the only possible sovereign immunity waiver for their claims, but argue

5    that they have satisfied APA § 704's "final agency action" requirement, or, alternatively, that it does not

6    apply. Doc. 55 at 6-12.

7            APA § 702 provides, in pertinent part:

8                    A person suffering legal wrong because of agency action, or adversely
                     affected or aggrieved by agency action within the meaning of a relevant
9                    statute, is entitled to judicial review thereof. An action in a court of the
                     United States seeking relief other than money damages and stating a claim
10                   that an agency or an officer or employee thereof acted or failed to act in an
                     official capacity or under color of legal authority shall not be dismissed
11                   nor relief therein be denied on the ground that it is against the United
                     States or that the United States is an indispensable party.

12   5 U.S.C. § 702. APA § 704 provides, in pertinent part: "Agency action made reviewable by statute and

13   final agency action for which there is no other adequate remedy in a court are subject to judicial

14   review." 5 U.S.C. § 704. The APA further defines "agency action" to "include[ ] the whole or a part of

15   an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5

16   U.S.C. § 551(13). Where the final agency action requirement applies, lack of APA finality precludes

17   judicial review. *Ukiah Valley Medical Ctr. v. F.T.C.,* 911 F.2d 261, 263-64 (9th Cir. 1990).

18       **3.    Final Agency Action.**

19           Plaintiffs first argue that the final agency action requirement is satisfied here. The APA defines

20   reviewable "agency action" to include "the whole or part of an agency rule, order, license, sanction,

21   relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13) ("§ 551(13)"). While this

22   definition is "expansive," federal courts "have long recognized that the term [agency action] is not so

23   all-encompassing as to authorize us to exercise judicial review over everything done by an

24   administrative agency." *Wild Fish Conservancy v. Jewell*, 730 F.3d 791, 800-01 (9th Cir. 2013) (quoting

25

1  *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 19 (D.C. Cir. 2006) (alteration in

2  original)). To qualify as "final," the action challenged must "mark the consummation of the agency's

3  decisionmaking process" and "must be one by which rights or obligations have been determined, or

4  from which legal consequences will flow." *Id.* at 801 (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78

5  (1997)).

6       Here, Plaintiffs argue "agency action" is present because:

7          The Bureau made and implemented a firm decision that it may use a State
           Board TUC as authority to fail to comply with water quality standards

8          adopted pursuant to the [CWA]. This decision was embodied in the TUC
           Petition submitted to the State Board and in the Bureau's subsequent

9          actions. The Bureau is now operating the CVP to comply with the TUC
           rather than the applicable standards. This action ... constitutes the

10         equivalent of a self-issued license, relief, and a "failure to act."

11 Doc. 55 at 7. Plaintiffs further argue that "[i]t is the action of submitting the TUC Petition to the State

12 Board followed by the Bureau's actual operation of the CVP to comply with the TUC in violation of the

13 water quality standards" that marks the consummation of the agency's decisionmaking process. Doc. 55

14 at 8-9.

15      As a threshold matter, the Court finds that Reclamation's filing the TUCPs with the State Board

16 roughly is the equivalent of Reclamation applying to the State Board for a permit. Plaintiffs point to no

17 authority that even remotely suggests that filing for a permit is agency action. At least one case, *Citizens*

18 *Legal Enforcement & Restoration v. Connor*, 762 F. Supp. 2d 1214, 1223-24 (S.D. Cal. 2011)

19 ("*CLEAR*"), *aff'd*, 540 F. App'x 587 (9th Cir. 2013), suggests otherwise. In *CLEAR*, the plaintiffs

20 alleged that Reclamation failed to obtain a necessary permit from a different federal agency under the

21 Rivers and Harbors Act of 1899 ("RHA"), 33 U.S.C. § 403, before completing a project on the Colorado

22 River that impacted flows in a particular area of concern to plaintiffs. *Id*. at 1218, 1223-24. The district

23 court in *CLEAR* held that obtaining a permit from another federal agency "is not like a rule, an order, a

24 license, a sanction, or relief." *Id*. at 1224 (citing 5 U.S.C. § 551(4), (6), (8), (10), (11)).

25      By obtaining a permit, a federal agency does not thereby set law or policy,

> or apply agency rules to a particular case. Similarly, one agency obtaining
> a permit from another agency is not akin to the first agency issuing a
> license. Nor is it similar to sanctioning or providing relief to a party. As
> such, Plaintiff's RHA challenge simply is not cognizable as an APA
> failure to act claim.

*Id.* CLEAR's reasoning is persuasive and provides compelling reasons to conclude that filing a TUCP

with the State Board is not "agency action."

Nor does the Bureau's implementation of the TUCP Orders approving in part the TUCPs

constitute "agency action." As the Ninth Circuit explained in *Wild Fish Conservancy*, 730 F.3d at 801,

the mere operation of a water project does not constitute "agency action." In *Wild Fish Conservancy*,

plaintiffs alleged that the U.S. Fish and Wildlife Service was operating gates at a hatchery in a manner

that dewatered a one-mile segment of a creek. *Id.* at 794-95. Plaintiffs further alleged that the agency's

operation of the gates obstructed fish passage in violation of Washington State law, which in turn

violated Section 8 of the Reclamation Act of 1902, which requires federal reclamation projects be

operated in compliance with state water law. *Id.* at 704-95, 800-801. The Ninth Circuit concluded that

the allegation that the defendant agency "operate[d] dams [] in a manner that obstructs fish passage ...

during some or all of the year" was a "vague allegation [that] is insufficient," because, among other

things, "it does not identify a discrete 'agency action' that fits within the APA's definition of that term."

*Id.* at 801. While acknowledging that the gate closures had "immediate physical consequences, such

action is not fairly analogous to a 'rule, order, license, sanction, [or] relief.'" *Id.* (quoting § 551(13)).

Moreover, this Court has previously found that Reclamation's day-to-day operation of the CVP

is not "agency action," absent a specific implementation order issued by Reclamation. *See San Luis &*

*Delta-Mendota Water Auth. v. U.S. Dep't of the Interior*, 870 F. Supp. 2d 943, 954 (E.D. Cal. 2012)

(generic challenge to Reclamation's claimed discretion to order reduced export pumping during a period

of "excess water conditions" not reviewable because not "final agency action," while challenge to

specific pumping reduction order was subject to review). Likewise, the present case is unlike *NWF v.*

*USACOE*, 92 F. Supp. 2d 1072, cited by Plaintiffs, which concerned a challenge to the operation of four

1   dams pursuant to two formal Records of Decision ("ROD"). It is well established that, absent some

2   appellate process delaying the immediate effectiveness of a ROD, the issuance of a ROD constitutes

3   "final agency action." *City of Las Vegas, Nev. v. F.A.A.*, 570 F.3d 1109, 1114 (9th Cir. 2009) (ROD

4   issued under the National Environmental Policy Act constituted final agency action); *Nat'l Parks &*

5   *Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1064 (9th Cir. 2010) (ROD subject to

6   administrative appeal not final agency action). Plaintiffs fail to point to a ROD, or any other similar

7   document, issued by Reclamation in this case.

8          In contrast, where an agency has formally articulated its position in a rule or a memorandum

9   interpreting a rule, agency action exists. *Siskiyou Reg'l Educ. Project v. U.S. Forest Serv.*, 565 F.3d 545,

10  554-55 (9th Cir. 2009) (finding final agency action where plaintiffs challenged Forest Service's actions

11  taken pursuant to its formal interpretation of a rule in a Memorandum to Regional Foresters); *see also*

12  *Wild Fish Conservancy*, 730 F.3d at 801 (distinguishing *Siskiyou* on the ground that the Forest Service's

13  formal statement of agency policy in the Memorandum to Regional Foresters was "fairly analogous to a

14  'rule' and thus fell within the ambit of § 551(13)."). However, Plaintiffs have pointed to no formal

15  articulation of Reclamation policy akin to that present in *Siskiyou*. Plaintiffs attempt to argue that filing

16  the TUCP was akin to a formal statement of agency policy, but, as discussed above, the closest relevant

17  authority, *CLEAR*, persuasively suggests a permit application does not rise to the level of agency action.

18         Finally, Plaintiffs cannot evade the requirement of "agency action" by labeling the circumstances

19  at issue in this case a "failure to act." The Supreme Court has made it abundantly clear that § 551(13)'s

20  reference to "failure to act" is "properly understood as a failure to take an <u>agency action</u>-that is, a failure

21  to take one of the agency actions (including their equivalents) earlier defined in § 551(13)." *Norton v. S.*

22  *Utah Wilderness Alliance*, 542 U.S. 55, 62-63 (2004) ("*SUWA*") (emphasis added).[3] The FAC does not

23  _____

24  [3] To maintain an APA § 706(1) "failure to act claim," plaintiffs would additionally have to allege plausibly that Reclamation
    "failed to take a discrete agency action that it is required to take." *SUWA*, 542 U.S. at 64. Whether the FAC satisfies this
25  requirement by alleging violations of the CPVIA and the CWA is a complex question. *SUWA* explained that the power to
    mandate "discrete agency action" is "normally limited to enforcement of a specific, unequivocal command ... about which [an

1    point to an agency action that Reclamation failed to take.

2        Therefore, the Court concludes that no "agency action," let alone any "final"[4] agency action, has

3    been alleged in this case.

4    **4.    Plaintiffs' Argument that the "Final Agency Action" Requirement Does Not Apply to their Claims.**

5        Plaintiffs alternatively argue that the "final agency action" requirement does not apply to their

6    claims. They offer several sub-arguments in support of this proposition.

7        **a.    Claims Based Upon Statutes Other than the APA.**

8        Plaintiffs argue that § 704's "final agency action" requirement does not apply where a claim is

9    not brought under the APA. Doc. 55 at 12. This is true as a general proposition. The APA's final agency

10   requirement does not apply to certain claims that arise under citizen suit provisions that provide private

11   right of actions to bring suit for violations of certain environmental statutes. For example, the CWA's

12   citizen suit provision allows a citizen to commence a civil action "against any person ... who is alleged

13   to be in violation of [] a[] [CWA] effluent standard or limitation." 33 U.S.C. § 1365(a). In *Oregon*

14   *Natural Res. Council v. U.S. Forest Serv.*, 834 F.2d 842, 848 (9th Cir. 1987) ("*ONRC*"), the Ninth

15   Circuit found that the CWA's citizen suit provision only applies to claims alleging violations of effluent

16   standards or limitations established to control point source pollution, while plaintiffs aiming to enforce

17   state water quality standards applicable to nonpoint sources must bring their claim pursuant to the APA

18   and demonstrate "final agency action."

19       Here, however, Plaintiffs do not allege that any of their claims arise under the CWA's citizen suit

20

21   _____

22   official] had no discretion whatever." *Id.* at 63-64. A request for "a general order compelling compliance with [a statutory] mandate, without suggesting any particular manner of compliance," will fail, because "[g]eneral deficiencies in compliance ... lack the specificity requisite for agency action." *Id.* at 66; *but see CLEAR*, 762 F. Supp. 2d at 1232 (finding Article X, section 2 of the California Constitution, which requires that "the waste or unreasonable use or unreasonable method of use of water

23   be prevented," to be a "discrete and required duty under *SUWA*," but failing to address whether the agency action requirement would be satisfied). It is unnecessary to reach this issue because "agency action" is a prerequisite to any "failure

24   to act claim" under *SUWA*, and no agency action is present here.

25   [4] The Court finds it unnecessary to address the "finality" requirements because no "agency action" is present.

provision. First, Plaintiffs allege that Reclamation's operation of the CVP pursuant to the TUCP Orders violate CWA water quality standards, rather than effluent limitations.[5] FAC at ¶ 7. Moreover, the dams and other structures that make up the CVP are at least arguably nonpoint sources under the CWA. *NWF v. USACOE*, 92 F. Supp. 2d at 1075 (citing 33 U.S.C. § 1314(f) for the proposition that "[d]ams have been treated by the courts as nonpoint sources under the [CWA]); *National Wildlife Fed'n v. Gorsuch*, 693 F.2d 156, 175 (D.C. Cir. 1982)). Pursuant to *ONRC*, Plaintiffs' CWA claims do not fall within the scope of the CWA citizen suit provision and must be brought under the APA or not at all.

Likewise, it is well established that the CVPIA does not contain a citizen suit provision and that, accordingly, CVPIA claims must arise under the APA. *San Luis & Delta-Mendota Water Auth. v. U.S. Dep't of Interior*, 637 F. Supp. 2d 777, 785 (E.D. Cal. 2008), *on reconsideration*, 624 F. Supp. 2d 1197 (E.D. Cal. 2009), *aff'd sub nom. San Luis*, 672 F.3d 676; *Friant Water Auth. v. Jewell*, 23 F. Supp. 3d 1130, 1144 n.8 (E.D. Cal. 2014); *see also San Luis*, 672 F.3d at 699 (applying APA to claim based upon the CVPIA).

Therefore, Plaintiffs cannot establish that they can bring their claims directly under any alternative statute.

### b. *Presbyterian Church.*

Plaintiffs also make reference to an additional line of authority that suggests APA § 704's "final agency action" requirement does not apply to all claims invoking APA § 702 as a waiver of sovereign immunity. In *The Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 523-26 (9th Cir. 1989), the Ninth Circuit held that Congress did not limit APA § 702's sovereign immunity waiver to "final

---

[5] Unlike water quality standards, *see supra* note 1, "effluent limitations" are promulgated by the EPA and restrict the quantities, rates, and concentrations of specified substances discharged from point sources. 33 U.S.C. §§ 1311, 1314.

These effluent limitations are translated into enforceable obligations in National Pollutant Discharge Elimination System (NPDES) permits issued to "point source" or end-of-pipe dischargers. Section 1342. The [CWA] prohibits the release of pollutants from point sources except in compliance with an NPDES permit. Section 1311. The [CWA] provides that any citizen may bring an action against an agency alleged to be in violation of an effluent limitation. Section 1365(a).

*NWF v. USACOE*, 92 F. Supp. 2d at 1074.

1   agency action," and accordingly declined to read APA § 704's final agency action requirement as a bar

2   to claims for equitable relief against a government agency's investigations alleged to have violated First

3   and Fourth Amendment rights. Shortly after *Presbyterian Church* was decided, the Supreme Court

4   decided *Lujan v. National Wildlife Federation*, 497 U.S. 871, 882 (1990), which held that "agency

5   action" is a requirement of APA § 702 and looked to 5 U.S.C. § 551(13) to define that phrase. It is

6   unclear whether, if at all, *Presbyterian Church*'s holding survives *Lujan* and related Ninth Circuit

7   precedent. *See Rattlesnake Coalition v. EPA*, 509 F.3d 1095, 1103 (9th Cir. 2007) (explaining that

8   "[w]hen a claim is brought pursuant to the APA, the agency action must be a 'final agency action for

9   which there is no other adequate remedy in court.' 5 U.S.C. § 704."); *Gallo Cattle Co. v. U.S. Dept. of*

10  *Agriculture*, 159 F.3d 1194, 1198 (9th Cir. 1998) (holding "the APA's waiver of sovereign immunity

11  contains several limitations," including APA § 704's "final agency action" requirement); *but see Gros*

12  *Ventre Tribe v. United States*, 469 F.3d 801, 808-809 (9th Cir. 2006) (noting without resolving a

13  "conflict" between *Gallo Cattle* and *Presbyterian Church*); *Siskiyou*, 565 F.3d at 554 n. 8 ("In light of

14  our determination that [plaintiff] challenges final agency action, we need not address the 'intra-circuit

15  split' that we have recognized exists on the question whether the 'final agency action' requirement of the

16  APA is jurisdictional.").

17       *San Carlos Apache Tribe v. United States*, 417 F.3d 1091, 1096 (9th Cir. 2005), provides an

18  example of how these cases can be reconciled in practice. In that case, the San Carlos Apache Tribe

19  sought to maintain certain water levels in a reservoir in Arizona. *Id*. at 1092. The Tribe brought suit

20  against various federal agency defendants under, among other things, the National Historic Preservation

21  Act ("NHPA"), 16 U.S.C. §§ 470 *et seq.*, which requires federal agencies to "take into account the effect

22  of the[ir] undertaking[s] on any district, site, building, structure, or object that is included or eligible for

23  inclusion in the national Register." *San Carlos*, 417 F.3d at 1092-93. The Tribe argued that its suit was

24  properly brought as a private right of action directly under NHPA rather than under the APA. *Id*. at

25  1093. The Ninth Circuit quoted *Presbyterian Church* for the general proposition that "in enacting the

1   APA 'Congress was quite explicit about its goals of eliminating sovereign immunity as an obstacle in

2   securing judicial review of the federal official conduct.'" *Id.* at 1096 (quoting *Presbyterian Church*, 870

3   at 524). However, in *San Carlos*, the Court of Appeals found that the case could not "proceed directly

4   under [the NHPA] and bypass the APA," because this would permit litigants to "sidestep the traditional

5   requirements of administrative review under the APA" including "procedural requirements" such as

6   requiring "the challenged agency action [to be] final." *Id.* Critical to *San Carlos*'s reasoning was the

7   Ninth Circuit's finding that NHPA, like the analogous National Environmental Policy Act ("NEPA"),

8   does not create a private right of action. *Id.* at 1097-98. Therefore, although APA § 702 may waive

9   sovereign immunity, absent a private right of action to sue the United States directly under the

10   substantive statute, a plaintiff may not sidestep the APA's procedural requirements. *Id.* at 1098-99.

11          This line of reasoning is also found in *Gros Ventre*, in which a coalition of Indian Tribes sued

12   several federal agencies for violating federal obligations to protect tribal trust resources by authorizing

13   and planning to expand two gold mines located upriver from the Tribes' lands. 469 F.3d at 803. The

14   Tribal plaintiffs argued they did not need to satisfy the "final agency action" requirements set forth in

15   APA § 704. *Id.* at 808. The Ninth Circuit recognized that there is a "conflict" in the Circuit's case law

16   between *Presbyterian Church*, 870 F.2d 518, which supported the Tribes' argument that APA § 702's

17   waiver of sovereign immunity is not limited to only "agency actions," and *Gallo Cattle*, 159 F.3d 1194,

18   which supported federal defendants' contrary position that the APA's waiver of sovereign immunity

19   contains several limitations, including APA § 704's "final agency action" requirement. *See Gros Ventre*,

20   469 F.3d at 808-09. The *Gros Ventre* decision declined to reconcile the conflict, however, because it

21   found that the Tribes "did not have a common law cause of action for breach of trust"[6] and "the statutes

22   that the Tribes cite authorize no private right of action." *Id.* at 809. Therefore, the Tribes must "state

23   _____

24   [6] The federal common law can create private rights of action. *See Oneida Cnty., N.Y. v. Oneida Indian Nation of New York State*, 470 U.S. 226, 240 (1985) (acknowledging that tribal plaintiffs had a cause of action under federal common law for

25   violation of possessory property rights).

1  their claims within the confines of the APA." *Id*. To do so, as the remainder of the *Gros Ventre* decision

2  makes clear, the Tribes had to challenge a "final agency action." *See id*. at 814 (because NHPA and

3  NEPA, the bases for the Tribes' two claims, did not provide a private right of action, the Tribes "must

4  rely on the APA to state a claim," which could not proceed because the only "final agency action" that

5  occurred within the six-year statute of limitation period had been vacated); *see also Trudeau v. Fed.*

6  *Trade Comm'n*, 384 F. Supp. 2d 281, 294 (D.D.C. 2005), *aff'd*, 456 F.3d 178 (D.C. Cir. 2006) (while

7  acknowledging that under Presbyterian Church and related D.C. Circuit authority, § 702 may waive

8  sovereign immunity, "in the absence of a final agency action under section 704, [plaintiff] must identify

9  some provision other than [APA § 704] that gives rise to a cause of action against the [defendant]

10  agency for acting outside of its statutory authority").

11       Applying these principles here, Plaintiffs cannot evade the APA § 704's final agency action

12  requirement. Plaintiffs bring two claims: one under the CVPIA, for which, as explained above, there is

13  no citizen suit provision or other source of a private right of action; and another under provisions of the

14  CWA to which the CWA's citizen suit provision does not apply. Neither claim provides an independent

15  private right of action apart from that provided by the APA. Therefore, as in *San Carlos* and *Gros*

16  *Ventre*, Plaintiffs cannot avoid compliance with the APA's procedural requirements, including the "final

17  agency action" requirement.[7]

18  

---

19  [7] *Presbyterian Church* can be explained in this construct by virtue of the fact that it raised claims that a federal agency

20  violated the U.S. Constitution. Constitutional provisions can give rise to <u>direct</u> rights of action for declaratory and injunctive relief, and sometimes for damages. *See Shaw v. Delta Air Lines, Inc*., 463 U.S. 85, 96 n.14, (1983) ("A plaintiff who seeks injunctive relief from state regulation, on the ground that such regulation is preempted by a federal statute which, by virtue of the Supremacy Clause of the Constitution, must prevail, thus presents a federal question which the federal courts have

21  jurisdiction under 28 U.S.C. § 1331 to resolve."); *Bud Antle, Inc. v. Barbosa*, 45 F.3d 1261, 1269 (9th Cir. 1994) (a private party may seek declaratory and injunctive relief against enforcement of a state statutory scheme on the ground of federal

22  preemption); *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971) (recognizing a private right of action for damages arising directly under the U.S. Constitution when a plaintiff alleges that a federal official has violated his or her constitutional rights while acting under the color of law); *Clouser v. Espy*, 42 F.3d 1522, 1527 n.5 (9th Cir. 1994) (takings clause of the

23  Fifth Amendment to the U.S. Constitution provides private right of action and pathway for direct suit against a federal agency without the requirement of proceeding under the APA); *Broughton Lumber Co. v. Yeutter*, 939 F.2d 1547, 1556 (Fed. Cir.

24  1991) (takings clause of U.S. Constitution is self-executing); *see also Civil Rights Cases*, 109 U.S. 3, 20 (1883) (Fourteenth Amendment "is undoubtedly self-executing without any ancillary legislation"); *Ex parte Young*, 209 U.S. 123 (1908)

25  (approving issuance of injunctive relief claimed directly under Fourteenth Amendment); *Allen v. State Bd. of Elections*, 393 U.S. 544, 556 n.21 (1969) ("Of course the private litigant could always bring suit under the Fifteenth Amendment."). At least

### c.    <u>Doctrine of Non-Statutory Review</u>

Finally, Plaintiffs point to the doctrine of "nonstatutory review," which, according to Plaintiffs, permits a federal district court to "review an agency action that is *ultra vires* even in the absence of an explicit grant of statutory review pursuant to the general 'federal question' jurisdiction of the Court." Doc. 55 at 11. The doctrine finds its origins in *Leedom v. Kyne,* 358 U.S. 184 (1958), which concerned an action brought by a union president against National Labor Relations Board ("NLRB") members to set aside certification of a bargaining unit which included both professional and nonprofessional employees, despite a statutory requirement that the professional employees should have the opportunity to vote on whether they wish to be included. *Id*. at 185-87. The Supreme Court held that a federal district court had jurisdiction to review the certification, despite the absence of express authorization of judicial review of such determinations. *See id.* at 188-89. The Court stated that it "cannot lightly infer that Congress does not intend judicial protection of rights it confers against agency action taken in excess of delegated powers." *Id.* at 190. Thus, after finding that the agency was violating a "clear" statutory right, the Supreme Court held that an action for injunction relief could proceed under the "statutory provisions governing general jurisdiction." *Id.*

The rule articulated in *Leedom* has come to be known as "nonstatutory review." The most frequently cited modern articulation of the doctrine is found in *Rhode Island Dep't of Envtl. Mgmt. v. United States*, 304 F.3d 31, 41-43 (1st Cir. 2002). There, the State of Rhode Island brought suit to enjoin an administrative investigation proceeding before the Department of Labor pursuant to the Solid Waste Disposal Act ("SWDA"), 23 U.S.C. §§ 6901-6992k, which, among other things, prohibits retaliation against an employee who initiates or testifies in a proceeding brought pursuant to the SWDA. *Id*. at 36-37. Several employees of the Rhode Island Department of Environmental Management brought complaints pursuant to the SWDA's whistleblower protection provision. *Id*. at 38. In at least one of the

---

one court has restricted *Presbyterian Church*'s holding to claims alleging that an administrative agency violated the U.S. Constitution. *See Navajo Nation v. U.S. Dep't of the Interior*, 34 F. Supp. 3d 1019, 1030 (D. Ariz. 2014).

pending investigatory proceedings, a Department of Labor Administrative Law Judge ("ALJ") found

that the proceedings were not barred by Rhode Island's sovereign immunity. *See id*. at 40 (discussing

"the ALJ's adverse immunity determination"). Rhode Island brought suit in federal court to enjoin the

pending administrative proceedings, alleging that the proceedings infringed upon the Rhode Island's

constitutionally protected sovereign interests. *Id*. at 36-38.

The Department of Labor argued that Rhode Island had "impermissibly sought review of agency

action that is not 'final' within the meaning of APA § 704." *Id*. at 40. The First Circuit began its analysis

by noting "the strong presumption that Congress intends judicial review of administrative action." *Id*. at

41 (quoting *Bowen v. Mich. Acad. of Family Physicians,* 476 U.S. 667, 670 (1986)).

> The presumption of judicial review "may be overcome 'only upon a
> showing of clear and convincing evidence of a contrary legislative
> intent.'" *Traynor v. Turnage,* 485 U.S. 535, 542 (1988) (quoting *Abbott
> Labs. v. Gardner,* 387 U.S. 136, 141 (1967)). Thus, even where a litigant
> is unable to ground his action on either a specific or general statutory
> review provision, judicial relief is not necessarily foreclosed. *See id*. at
> 545; *Bowen,* 476 U.S. at 67. Given the right circumstances, review of
> agency action may be available in federal district court utilizing the
> procedures of so-called "nonstatutory review." *Chamber of Commerce v.
> Reich,* 74 F.3d 1322, 1328 (D.C. Cir. 1996); *see generally* Richard H.
> Fallon et al., *Hart and Wechsler's The Federal Courts and The Federal
> System* 995-99 (4th ed. 1996) (discussing the pedigree and evolution of
> nonstatutory review).

*Id*. at 41-42. The First Circuit then explained that the "basic premise behind nonstatutory review is that,

even after the passage of the APA, some residuum of power remains with the district court to review

agency action that is *ultra vires*." *Id*. at 42 (internal citation and quotation omitted). Relying on *Leedom*,

the First Circuit articulated two "critical factors" that "must be present to invoke nonstatutory review."

*Id*. at 42. First, the agency's nonfinal action must "wholly deprive the party of a meaningful and

adequate means of vindicating its rights." *Id*. (internal citation and quotation omitted). Second,

"Congress must not have clearly intended to preclude review of the agency's particular determination."

*Id*. (internal citation and quotation omitted). "[T]he evidence of Congress's intent to preclude review

must be clear and convincing." *Id*. "Where either of these factors is absent, nonstatutory review is

18

1    unavailable." *Id.*

2        In *Rhode Island*, the First Circuit found that the requirements of nonstatutory review were

3    satisfied. First, absent immediate judicial review, permitting the Department of Labor proceedings

4    would "wholly deprive the state of a meaningful and adequate means of vindicating its rights," namely,

5    its asserted Constitutional sovereignty interests. *Id*. at 43. Second, the First Circuit found no indication

6    that Congress specifically intended to preclude review of the agency's immunity determinations,

7    because, while the SWDA provides a mechanism for judicial review of the Department of Labor's

8    determinations of whether an employee was retaliated against, the agency's rulings regarding sovereign

9    immunity are collateral to the SWDA's review provisions and outside the agency's expertise. *Id*.

10   Finally, the First Circuit emphasized that "general equitable considerations" favored a nonstatutory

11   action, including the fact that Rhode Island had claimed the violation of "a clear right that is

12   constitutional in nature" and that its "immunity would be effectively lost absent judicial review." *Id*.; *see*

13   *also Commonwealth of Puerto Rico v. United States*, 490 F.3d 50, 59 (1st Cir. 2007) (reiterating *Rhode*

14   *Island*'s articulation of the nonstatutory review doctrine)

15       In the Ninth Circuit, the doctrine of nonstatutory review appears to be circumscribed even

16   further. For example, in *Baker v. Int'l Alliance of Theatrical Stage Employees & Moving Picture*

17   *Operators of U.S. & Canada*, 691 F.2d 1291, 1294 (9th Cir. 1982), which itself arose in the context of

18   the National Labor Relations Act ("NLRA"), the Ninth Circuit noted that "the *Leedom v. Kyne*,

19   exception has been narrowly construed even in the certification context in which it arose." In fact, the

20   Court has been unable to locate a single Ninth Circuit case that ever seriously considered applying

21   nonstatutory review outside the context of labor relations law. *See, e.g., Nat'l Ass'n of Agric. Employees*

22   *v. Fed. Labor Relations Auth*., 473 F.3d 983, 989 (9th Cir. 2007) (determination by the Federal Labor

23   Relations Authority that certain government employees are professionals); *NLRB v. California Horse*

24   *Racing Bd.*, 940 F.2d 536, 541 (9th Cir. 1991) (concerning preemption by NLRA of California labor

25   agency's administrative order regarding negotiation of a collective bargaining agreement); *Staacke v.*

1    *U.S. Sec'y of Labor*, 841 F.2d 278, 282 (9th Cir. 1988) (challenge to Department of Labor's Office of

2    Workers' Compensation Programs determination of eligibility for disability awards); *Bays v. Miller*, 524

3    F.2d 631, 633 (9th Cir. 1975) (lawsuit seeking order directing NLRB's General Counsel to reconsider an

4    unfair labor practice charge); *Teamsters, Chauffeurs, Helpers & Delivery Drivers, Local 690 v. NLRB*,

5    375 F.2d 966, 968 (9th Cir. 1967) (action to set aside NLRB decision and to order NLRB to conduct an

6    election).

7        Moreover, in *Amerco v. NLRB*, which concerned a request to enjoin an ongoing unfair labor

8    practices hearing before the NLRB, the Ninth Circuit quoted *Leedom* for the proposition that

9    nonstatutory review applies where the "absence of jurisdiction of the federal courts would mean a

10   sacrifice or obliteration of a right which Congress has given professional employees." 458 F.3d 883, 889

11   (9th Cir. 2006) (quoting *Leedom*, 358 U.S. at 190). The Ninth Circuit reasoned that *Leedom* "held that

12   the district court has jurisdiction to enter injunctive relief against certain representation decisions when a

13   party's statutory or constitutional rights otherwise might never be vindicated." *Id*.

14       Here, Plaintiffs assert that dismissal of their claims on the ground that the Bureau's actions did

15   not constitute "final agency action" would "allow the Bureau to continue its unlawful practices

16   unchecked." *See* Doc. 55 at 11 n.2. Plaintiffs further argue that "[t]here is no indication that Congress

17   intended for the Bureau to scheme with DWR and the State Board to use California's TUC procedure an

18   a governor's waiver of state law to provide the Bureau a waiver of the federal requirements under the

19   CWA and the CVPIA." *Id*. This Court declines to extend nonstatutory review beyond its current limits

20   in this Circuit. Even assuming the doctrine of nonstatutory review applies outside the labor context

21   within the Ninth Circuit, Plaintiffs have not pointed to any "statutory right"[8] or federal constitutional

22

23   [8]  Some cases have referred to the right to sue under the CWA's citizen suit provision a "statutory right." *See, e.g.*, *George v.
     Reisdorf Bros.*, 696 F. Supp. 2d 333, 337 (W.D.N.Y. 2010), *aff'd*, 410 Fed. App'x 382 (2d Cir. 2011); *Cmty. of Cambridge*
24   *Envtl. Health & Cmty. Dev. Grp. v. City of Cambridge*, 115 F. Supp. 2d 550, 560 (D. Md. 2000); *Hudson Riverkeeper Fund,
     Inc. v. Yorktown Heights Sewer Dist.*, 949 F. Supp. 210, 212 (S.D.N.Y. 1996). But, as discussed above, none of Plaintiffs'
25   claims fall within the scope of the CWA's citizen suit provision. The Court has been unable to locate any cases that have
     labeled the CWA's nonpoint source water quality standards as "statutory rights." Rather, the water quality standards are

1    provision at issue in this case. They therefore fail to invoke properly the doctrine of nonstatutory

2    review.[9]

3          In sum, Federal Defendants' motion to dismiss must be granted because this Court lacks

4    jurisdiction over Plaintiffs' remaining claims. Plaintiffs have not identified any "agency action" subject

5    to review under the APA and none of the exceptions to the "final agency action" requirement apply. It is

6    therefore unnecessary to address Federal Defendants' alternative motion that Plaintiffs claims should be

7    dismissed for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6).

8    **C.    Leave to Amend.**

9          No party has addressed whether Federal Defendants' motion should be granted with leave to

10   amend. The Court is unable to determine from the present record whether amendment would be futile, as

11   there may be some aspect of Reclamation's activities in connection with implementation of the TUCP

12   Orders that does qualify as final agency action. Therefore, the parties shall be afforded a brief period of

13   time to supplement the record as to this issue only.

14                          **CONCLUSION AND ORDER**

15        For the reasons set forth above:

16              (1) Federal Defendants' motion to dismiss for lack of subject matter jurisdiction pursuant

17                  to Fed. R. Civ. P. 12(b)(1) is GRANTED;

18              (2) Plaintiffs shall have ten (10) days from entry of this order to file a supplemental brief,

19                  no longer than seven (7) pages in length demonstrating why leave to amend is warranted;

20                  and

21

22   _____

     better described as "statutory obligations." *Cf Davis v. Passman*, 442 U.S. 228, 241 (1979) (discussing as distinct statutory
23   "rights" and "obligations").

24   [9] The Court is less convinced by Federal Defendants' argument that Plaintiffs have a forum to protect their interests because
     they "can seek, and have in fact sought, judicial review in state court of the [State] Board's TUCP Order." Doc. 56 at 7. If
     Plaintiffs are correct that Governor Brown's Proclamation and Executive Order and the State Board's subsequent TUCP
25   Orders do not relieve Federal Defendants of their obligations under Federal Law, it is unclear how such issues can be raised
     an action in state court challenging the TUCP Orders.

                                    21

1    (3) Thereafter, Federal Defendants shall have seven (7) days to file a response no longer

2    than seven (7) pages in length.

3    The Clerk of Court is directed <u>not</u> to close the case at this time.

4    **IT IS SO ORDERED**
     **Dated: October 20, 2015**

5                                          **/s/ Lawrence J. O'Neill**
                                        **United States District Judge**

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25